[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage. These litigants were married October 11, 1996, in Fairfield, Connecticut. There are no minor children issue of this marriage. The plaintiff is terminally ill. The defendant enjoys relatively good physical health.
The litigants have lived in Connecticut for at least twelve months prior to the commencement of this dissolution action. Therefore this court has jurisdiction. The marriage has broken down irretrievably, and a decree of dissolution will enter on that ground.
I. Facts of the Case
At the time of the court trial, the plaintiff was a fifty-two year old, self-employed painting contractor. He receives additional income from the rental of a condominium that he owned at the time of the marriage. The plaintiff's work schedule has varied throughout the marriage. The plaintiff had been married once before. His first wife, Theresa, died from complications from an Acquired Immune Deficiency Syndrome (AIDS). The plaintiff and Theresa had one child, Frank Jr. At the time of the trial, the child was a freshman in high school.
The defendant is a fifty-three year old, licensed practical psychiatric nurse who works for the Greater Bridgeport Mental Health Center. She currently earns over $24 per hour. She too had a prior marriage. At the time of the trial, the plaintiff had three adult sons.
Shortly after the death of the plaintiff's first wife in January 1995, these parties began dating. They met at an Alcoholics Anonymous meeting.[1] Eventually they fell in love. Throughout this courtship, the defendant was aware that the plaintiff was infected with the AIDS virus.
A former drug addict, in 1990 the plaintiff received a diagnosis that he had been infected with the AIDS virus. Nevertheless, when he first met the defendant, the plaintiff was relatively healthy and active. By the time of this trial, the plaintiff's health had deteriorated significantly. CT Page 9756
The plaintiff has two terminal infectious diseases, AIDS and Hepatitis C. As a result of the dual infection, the plaintiff suffers from low testosterone levels, fatigue, loss of libido and depression. The plaintiff also experiences chronic foot pain, a condition that will worsen progressively. Eventually, the pain will eliminate his ability to earn a living.[2]
The stress generated from the instant proceedings has contributed to these conditions. The plaintiff's entire immune system is affected. Eventually, the plaintiff will have increased swelling, blood clotting and high blood pressure. He will die from esophagus swelling or liver failure.
Although the plaintiff might have had a normal life span had he been infected with a simple strain of AIDS, the plaintiff has a multi-drug-resistant variety of the disease. As a result, he has an increased risk for AIDS-related infections. Usually, individuals with the plaintiff's medical condition have a life expectancy of seven years from the date of diagnosis. According to his physician, the plaintiff is "living on borrowed time." The eventual collapse will be rapid.[3]
The plaintiff is heavily medicated. Unfortunately in the plaintiff's case, the only drugs available for the treatment of Hepatitis C would cause an unacceptable suicide risk. The plaintiff has high medical expenses. After these dissolution proceedings, those costs will rise to approximately $1,200 monthly for insurance alone. His prescriptions will cost even more.
The defendant's health is substantially better than that of her husband. Her major problem is a recently diagnosed attention deficit disorder for which she receives regular medication.
These litigants separated November, 2000. Their household could not function as a family unit. The parties could not communicate in a non-violent manner. This mutual failure is the cause of their marital breakdown.
The primary source of controversy was the plaintiff's son, Frank Jr. The plaintiff married the defendant shortly after the death of his first wife. He thought she would be a compassionate stepmother. The relationship between the defendant and Frank Jr. was initially satisfactory.
The early rapport quickly disintegrated. Rather than provide nurturing, the defendant was cruel. Even when she tried to assist the CT Page 9757 child, she was more hurtful than helpful. Simply stated, the defendant had difficulty relating to this child, a boy whom she constantly bullied and ridiculed. Her derogatory comments were not confined to the marital home. She belittled the child when in the presence of third parties.[4]
Alienated, the child spent most of his time alone in his room, avoiding the defendant as much as possible. He had minimal interaction with the defendant.[5]
The situation involving his son naturally distressed the terminally ill plaintiff. In order to provide a nurturing environment, the plaintiff has arranged for Frank Jr. to live with an aunt upon his father's death. The plaintiff hopes that the child will eventually attend college, a possibility the defendant summarily rejects.[6]
The relations between the plaintiff and the defendant also deteriorated. They argued rather than communicated. Their disagreements extended beyond the care of Frank, Jr. They also argued about family finances. The plaintiff attempted to restrict the defendant insofar as she spent more than she earned. Furthermore, the defendant had erratic sleeping patterns.
Both litigants were mentally and emotionally abusive. Eventually the confrontations became physical. In 1998, the plaintiff assaulted the defendant. As a result, he was arrested and charged with assault in the third degree, a misdemeanor. Eventually, those criminal charges were nolled.[7] Although the parties temporarily reconciled, their marital difficulties continued. Finally, in November, 2000 the plaintiff filed this action. In January, 2001, he secured a restraining order. Since that date, the defendant has not been allowed to reside at the martial home.[8] The defendant has attempted on a number of occasions to secure a reciprocal restraining order, to no avail.[9]
There are marital assets. Shortly after these parties married, they purchased a home at 480 Wilson Street in Fairfield. The plaintiff provided the entire $50,000 down payment. The former marital residence, currently occupied by the plaintiff and his son, cost $240,000. Although there were conflicting appraisals, the court finds more credible the testimony of Robert Petrucci who, after considering all relevant factors, determined that the Wilson Street house was worth $360,000 at the time of the trial.
Through the four-year marriage, the plaintiff, his son, and the defendant occupied the house. The defendant's three sons also lived in the household for varying lengths of time. The parties used a joint checking account to pay for household expenses. Both litigants contributed to that account.[10] Upon her removal from the home in CT Page 9758 2001, the defendant stopped contributing to household expenses.
The parties had other real estate. Prior this marriage, the plaintiff purchased a condominium located on Kennedy Drive in Bridgeport. At the time of the marriage, that rental property was worth approximately $70,000. The plaintiff has $12,000 in equity in that property. After the parties separated, the defendant purchased property on Arthur Street in Bridgeport. The value of that property on the date of trial was $185,000. The defendant has nearly $40,000 equity in the property.
Both litigants entered this marriage with pre-existing debts. The plaintiff had credit card debt and federal tax liabilities. The defendant's primary debts were student loans acquired on behalf of the defendant's sons. During the marriage, those debts and most routine household expenses were paid through a joint checking and savings account. The plaintiff had a separate business account for his painting business. At times, the litigants also used that account to pay household expenses. The defendant had access to all joint accounts; the plaintiff paid all the household bills.
Neither of these litigants had concealed accounts or expenses. Both lived relatively simple lifestyles. The defendant liked to shop. The plaintiff went to movies and dinner with friends. He also enjoyed occasional trips to local casinos.
During this litigation, the defendant discovered that the plaintiff has under reported his income in several income tax returns. Those deficiencies have been addressed and the plaintiff has secured the services of an accountant to prepare amended returns. As a result of those amended returns, the plaintiff will have an additional $17,000 tax liability. He has assumed full responsibility for this business debt.
Based upon the information that resulted in these amended tax returns, the defendant argues that the plaintiff has hidden assets. She seeks a portion of the "undisclosed" income but admits that she has no proof that any money was ever hidden.
The difficulty with the defendant's position is that she presumes the unreported income still exists. To overcome this evidentiary deficiency, the defendant asks that this court infer there is "money in the mattress", locate those funds, determine an appropriate amount, and then divide that sum accordingly.
This court is unwilling to assume the defendant's burden of proof. A review of the evidence at trial establishes that all money accrued as a result of the defendant's painting business was used for business and CT Page 9759 household expenses. The defendant was aware of the business funds. She helped spend those funds. There are no hidden investments or bank accounts.
At trial, the defendant also sought access to a joint savings account established by the plaintiff for the benefit of Frank, Jr. Since his mother's death, the child has received a monthly social security survivor's benefit. Those $600 checks are automatically deposited into the savings account. Some of the accrued funds were used for camps and tuition.[11] The federal government placed a $15,000 lien on that joint account; the money withdrawn reflected the plaintiff's tax liability. Additionally, the plaintiff used $4,000 of the money for attorney's fees. The plaintiff lists this $19,000 as a debt to his son.
The status of the child is a significant factor in the property distribution. The defendant insists that she raised the plaintiff's standard of living when she "brought him into Fairfield.." She therefore seeks all of the plaintiff's assets, both real and imagined. Unfortunately, she also seeks those assets already held for the benefit of Frank, Jr. Those include life insurance policies.
The parties own a great deal of personal property. Many of these items were purchased before the marriage. Although the defendant had the ability to remove her belongings, some of her property remains at the marital home.[12]
II. Orders
The court has considered all the facts found in this memorandum of decision in light of the mandate of Connecticut General Statutes section46b-81. See Smith v. Smith, 185 Conn. 491, 493, 441 A.2d 140 (1981). The court, having considered all the evidence in light of all relevant statutory criteria, enters the following orders:
1. The marriage of the parties is dissolved on the grounds of an irretrievable breakdown.
2. Neither party shall receive alimony.
3. The plaintiff shall have exclusive use and possession of the marital home at 480 Wilson Street in Fairfield. He shall be responsible for, and shall indemnify the defendant against, payment of the mortgage, home equity loans, property taxes and insurance and shall be allowed in full any tax deductions therefore.
4. The plaintiff shall have exclusive use and possession of property CT Page 9760 located at 125 Kennedy Drive in Bridgeport. He shall be responsible for, and shall indemnify the defendant against, payment of the mortgage, home equity loans, property taxes and insurance and shall be allowed in full any tax deductions therefore.
5. The defendant shall have exclusive use and possession of the property located at 142 Arthur Street in Bridgeport. She shall be responsible for, and shall indemnify the defendant against, payment of the mortgage, home equity loans, property taxes and insurance and shall be allowed in full any tax deductions therefore.
6. Within thirty days of the entry of this judgment, the plaintiff shall pay the defendant the sum of $25,000.
7. With the exception noted in subparagraphs (a) and (b), all of the furniture and furnishings in the marital home are to be equally divided.
(a) The plaintiff's personal papers and effects, all personal property he owned prior to the marriage and gifts the plaintiff received during the course of the marriage are awarded to the plaintiff.
(b) The defendant's personal papers and effects, personal property she owned prior to the marriage, and gifts the defendant received during the course of the marriage, are awarded to the defendant.
8. If the litigants cannot divide the remaining personal property, they shall refer the matter to the family relations office for mediation. If the parties are still unable to resolve the distribution of the remaining personal property, that property shall be sold and the proceeds distributed equally.
9. The plaintiff is awarded all interest in the 1994 Ford and his 1998 motorcycle.
10. The defendant is awarded all interest in the 1974 Mercedes, the 1992 Honda and the 1996 Toyota.
11. The plaintiff is awarded the checking account listed on his financial affidavit. Furthermore, the savings account held for the benefit of the minor child, Frank Jr., shall remain the property of the minor child.
12. The plaintiff is awarded the stock account listed on his financial affidavit.
13. The defendant shall not be entitled to any interest in the CT Page 9761 insurance policies listed on the plaintiff's financial affidavit.
14. The defendant is awarded the credit union account listed on her financial affidavit.
15. The plaintiff's interest in any retirement plan shall remain his free of any claims by the defendant. The defendant shall execute any document necessary to terminate any rights she may have in the plan as may be requested by the plaintiff.
16. The defendant's interest in a retirement plan with her current employer shall remain hers free of any claims by the plaintiff. The plaintiff shall execute any document necessary to terminate any rights he may have in the plan as may be requested by the defendant.
17. Each party is responsible for his/her own attorney fees.
18. Except to the extent more specifically set forth herein, each order of the court is to be effectuated within thirty (30) days of the date of this decision.
19. Except to the extent more specifically set forth herein, each party shall retain all assets as shown on their respective financial affidavits free and clear of any claim or demand by the other, and each party shall be responsible for all liabilities as shown on their financial affidavits and shall indemnify and hold harmless the other party from liability therefore.
Judgment shall enter in accordance with the foregoing orders.
___________________ DEWEY, J.